UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT DETTMER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:10-CV-1329 (CEJ) |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I. Procedural History

On August 14, 2007, plaintiff Michael Dettmer filed applications for disability insurance benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, and Supplemental Security Income (SSI) under Title XVI of the Act, 42 U.S.C. §§ 1381 *et seq.*, with an alleged onset date of October 13, 2004. (Tr. 90-92, 93-97). After his applications were denied on initial consideration (Tr. 49-53), plaintiff requested a hearing from an Administrative Law Judge (ALJ) (Tr. 56-60).

The hearing was held on May 5, 2009. (Tr. 4-26). Plaintiff was represented by counsel. The ALJ issued a decision denying plaintiff's claims on July 21, 2009. (Tr. 34-46). The Appeals Council denied plaintiff's request for review on June 19, 2010. (Tr. 1-3). Accordingly, the ALJ's decision stands as the Commissioner's final decision. See 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

At the time of the hearing, plaintiff was 33 years old. (Tr. 9). He resided with his fiancee and her four children, ages 6, 9, 10 and 11, and their son, age 3. (Tr. 9-10, 14). Plaintiff testified his highest level of education was eighth grade. He stated that he dropped out because he was afraid of school, due to pressure, nerves and gang wars. (Tr. 9).

Plaintiff testified that he left his long-time job as a diesel mechanic and welder for Jack Cooper Transport after his doctor imposed a restriction on performing overhead work. (Tr. 10). In late 2006, he worked briefly at a retail outlet selling auto parts, but left because he could not manage stocking duties. (Tr. 10). He has had three surgical procedures performed on his right shoulder, and his left shoulder has problems arising from overuse. (Tr. 10, 12). An MRI performed the week before the hearing disclosed two tears and a degenerative AC joint. Id. His doctor recommended an injection. (Tr. 17). Plaintiff testified that he also has a herniated disk in his lower back. (Tr. 11).

Plaintiff testified that in 2005 or 2006 he weighed 190 pounds; at the time of the hearing he weighed 260 pounds. (Tr. 16, 12). He smoked about a pack of cigarettes a day. (Tr. 13). He testified that he can walk for about 15 minutes before he experiences chest pain, which he attributed to either gastric reflux or a leaking heart valve. (Tr. 12-13). He can stand for about 15 to 20 minutes but then his back begins to stiffen. He constantly shifts his position when sitting down. He can lift about 15 pounds. (Tr. 13). He also testified that he starts shaking and feeling nervous when he encounters a friend or a group of people. (Tr. 15). He had not seen a counselor for depression. (Tr. 14).

In response to questions from the ALJ, plaintiff testified that he spends his days moping around the house, sleeping, and watching television. (Tr. 13). However, he also stated that he takes care of his 3-year-old son with the help of his parents. (Tr. 14). During questioning by his lawyer, plaintiff testified that he spends 6 or 7 hours in his bedroom every day and 3 or 4 hours sleeping. (Tr. 15, 17). He has suicidal thoughts every day and crying spells about once a week. (Tr 16). He showers and changes his clothes just two or three times a week because his arms "just don't want to work." (Tr. 16). His hands go numb when he extends them or holds something. (Tr. 17-18).

Plaintiff's medications included Prozac,[1] Darvocet,[2] Prilosec,[3] Ibuprofen, Lisinopril,[4] Hydrochlorothiazide,[5] Cyclobenzaprine,[6] and Naproxen.[7] (Tr. 14). The side

---

[1]Prozac, or fluoxetine, is a psychotropic drug indicated for treatment of, *inter alia*, major depressive disorder. See Phys. Desk. Ref. 1772-72 (60th ed. 2006).

[2]Darvocet is a centrally acting narcotic analgesic agent indicated for relief from mild to moderate pain. It can produce dependence. See Phys. Desk Ref. 3497 (60th ed. 2006).

[3]Prilosec, or Omeprazole, is used alone or with other medications to treat ulcers, gastroesophageal reflux disease (GERD), and erosive esophagitis. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a693050.html (last visited on May 25, 2010).

[4]Lisinopril is indicated for the treatment of hypertension. See Phys. Desk. Ref. 2053 (61st ed. 2007).

[5]Hydrochlorothiazide is a diuretic used to treat high blood pressure. See http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682571.html (last visited on May 25, 2010).

[6]Cyclobenzaprine is a skeletal muscle relaxant which relieves muscle spasm of local origin without interfering with muscle function. See Phys. Desk Ref. 1481 (64th ed. 2010).

[7]Naproxen is the generic name for Naprosyn, a nonsteroidal anti-inflammatory drug used for relief of the signs and symptoms of tendonitis and pain management. See Phys. Desk Ref. 2769-70 (60th ed. 2006).

effects for the medication included headaches, dizziness, and blurred vision. (Tr. 15).
The ALJ asked about a notation by plaintiff's doctor in January 2009 that he had been
"off most of [his] meds" and that he had "run out of all of them [and] needed them
refilled [but] couldn't afford the Darvocet." (Tr. 19). Plaintiff testified in response that
he been switched to Ibuprofen, but had an allergic reaction, and was being placed back
on Darvocet. He also stated that he had been told that he was "a walking time bomb"
so he had consistently taken his blood pressure medications. Id.

James Israel, M.Ed., a vocational expert, provided testimony regarding the
employment opportunities for an individual of plaintiff's age, with his education,
training and work experience; who is right-handed; is limited to performing light
exertional work; can occasionally climb stairs and ramps; never climb ropes, ladders,
and scaffolds, frequently balance, stoop, kneel, crouch, and crawl; frequently push and
pull with the right arm; frequently reach in all directions; frequently lift overhead with
the left arm and never lift overhead with the right arm; and who must avoid
concentrated exposure to unprotected heights and hazardous machinery. (Tr. 21).
Mr. Israel opined that such an individual could not return to plaintiff's past work. (Tr.
22). However, such an individual would be able to work as a sales clerk, telephone
sales representative, or sales attendant. Id. The ALJ next asked the VE to assume
that the individual was limited to a sedentary exertion level; could occasionally climb
stairs and ramps; never climb ropes, ladders and scaffolds; occasionally balance,
stoop, kneel, crouch, and crawl; occasionally push and pull with the right arm;
occasionally reach in all directions; occasionally lift overhead with the left arm and
never lift overhead with the right arm; and who must avoid concentrated exposure to
unprotected heights and hazardous machinery. (Tr. 22-23). The VE opined that such

restrictions would preclude employment. (Tr. 23). Plaintiff's counsel asked the VE to assume that the hypothetical individual was limited to sitting or standing 30 minutes at one time; would need to walk every 45 minutes for about 15 minutes; and was likely to be absent from work about 2 days per month as a result of his impairments or the need for treatment.[8] (Tr. 23-24). The VE opined that no jobs would be available for an individual who needed to walk and take unscheduled absences so extensively. (Tr. 24).

The record contains a Disability Report completed by plaintiff. (Tr. 138-48). He identified his disabling conditions as depression, high blood pressure, rectal bleeding, mitral valve prolapse, herniated disc, hearing loss, shoulder pain, chronic pain in back and legs, and anxiety. (Tr. 139). These conditions limited his abilities to stand, bend, stoop, crawl, and sit for long periods of time. He reported that he cannot lift his arms to shoulder height or above. In addition, he had difficulty lifting or carrying objects. He also noted that his ability to concentrate is impaired and he has difficulty sleeping. He complained of anxiety and fatigue. (Tr. 139). Plaintiff's medications included Darvocet, Effexor,[9] Lisinopril, and Prilosec. (Tr. 146). An updated report completed on April 14, 2009, listed plaintiff's medications as Prozac, Lisinopril, Hydrochlorothiazide, Darvocet, Ibuprofen, Vicodin,[10] and Flexeril.[11] (Tr. 210).

---

[8]These limitations reflect those found by plaintiff's treating physician, Erin Piontek, M.D., on May 29, 2008. (Tr. 591-95).

[9]Effexor, or Venlafaxine, is indicated for the treatment of major depressive disorder. See Phys. Desk Ref. 3196 (63rd ed. 2009).

[10]Vicodin is a narcotic analgesic indicated for relief of moderate to moderately severe pain. Dependence or tolerance may occur. See Phys. Desk. Ref. 530-31 (60th ed. 2006).

[11]Flexeril is indicated as an adjunct to rest and physical therapy for relief of muscle spasm associated with acute musculoskeletal conditions. See Phys. Desk Ref.

Plaintiff also completed a Function Report. (Tr. 168-75). In describing his daily activities, he stated that he takes the children to school and returns home and tries to sleep. He tries to watch television "every once in awhile." (Tr. 168). He takes care of the family dog to the extent that he opens the door to let the dog out and puts food in the dog's dish. (Tr. 169). The pain in his shoulders significantly affects his ability to attend to his personal hygiene. Id. The pain also causes him to "toss and turn all night and day." Id. He used to love to cook but now he cannot stir foods or stand for long, so he prepares only simple meals like sandwiches. (Tr. 170). He can do light household chores for about 5 minutes at a time. Id. Plaintiff described his hobbies and interests as watching television; he also enjoys fishing and playing with the children, but cannot often engage in these activities. (Tr. 172). His conditions affect his abilities to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, use his hands, talk, hear, see, complete tasks, concentrate, understand, follow instructions and get along with others. His memory is also impaired. (Tr. 173). He experiences pain when lifting more than 5 or 10 pounds. He can walk a few hundred feet before needing to rest for 5 to 10 minutes. He can pay attention for about 10 minutes. Id. He cannot pay bills, manage a savings account, or use a checkbook; he can count change. (Tr. 171). He snaps at others and is always depressed or angry. (Tr. 173). He does not handle stress or changes in routine well. (Tr. 174). In response to a question regarding unusual fears, plaintiff wrote, "I hate myself, I can't do anything anymore, I have no future." Id. In a narrative portion, plaintiff wrote that he used to have a career and now he is always depressed and in pain. He cannot do heavy cleaning or climb the

---

1832-33 (60th ed. 2006).

stairs; his activities with his children are curtailed because he cannot play sports or go to the zoo. He cannot drive for long periods of time. (Tr. 175).

Plaintiff's fiancee Dorothy Yeager completed a Third-Party Function Report. (Tr. 159-67). She described plaintiff's daily activities as taking the kids to school and sleeping until she comes home from work; then he watches television and eats dinner before going to bed. (Tr. 159). Ms. Yeager stated that plaintiff tries to take care of their five children but noted that his mother comes to take care of their youngest while she is at work. (Tr. 160). She stated that plaintiff cannot sleep through the night and gets up frequently; he has difficulty dressing himself and does not bathe without reminders. He does not provide much help with household chores. She described him as "spacing out." (Tr. 163, 164). He cries all the time. (Tr. 165). He needs a hearing aid, but they cannot afford one. He mumbles and is hard to understand. Id.

## III. Medical Evidence[12]

Plaintiff sustained an injury at work on October 13, 2004. See Tr. 238. An MRI of his right shoulder on October 29, 2004, revealed mild degenerative changes of the acromioclavicular joint (AC joint) and mild biceps tendon tenosynovitis.[13] (Tr. 240). He began treatment for shoulder pain at Northland MidAmerica Orthopedics on November 4, 2004. (Tr. 238). He described an aching, stabbing pain, with a pins and

---

[12]The Administrative Transcript includes medical records belonging to a different Robert E. Dettmer, with an earlier date of birth. (Tr. 347-59). The ALJ excluded the records from his consideration. See Tr.8 (excluding Exhibit 5F). Unfortunately, the records were relied upon by the consultants completing the psychiatric review technique form and the physical residual capacity assessment. They were also cited by plaintiff's counsel in the brief in support of the complaint. The Court has excluded them from its consideration.

[13]Tenosynovitis is an inflammation of a tendon sheath which may result from trauma or overuse. Robert K. Ausman and Dean E. Snyder 3 Medical Library; Lawyers Edition § 4.6 (1989).

needles sensation. (Tr. 239). On examination, plaintiff had good range of motion in his neck and left arm. His right shoulder showed diffuse tenderness and guarding but no limitation on motion. He received an injection of Carbocaine and Kenalog[14] and was directed to go to physical therapy. Id. At follow-up on January 13, 2005, plaintiff had excellent range of motion of the shoulder. An MRI showed no structural abnormality. Plaintiff continued to complain of aching pain, however, and was directed to undergo a course of physical therapy. He was released to full work duty. (Tr. 236).

On February 3, 2005, plaintiff continued to complain of pain in his right shoulder. An MRI was unremarkable. On examination, he had good range of motion despite some tenderness. (Tr. 235). Plaintiff completed nine physical therapy sessions at the Work Performance Center between January 19, 2005 and February 16, 2005. (Tr. 269-78). Nonetheless, he continued to complain of sharp pain in his right shoulder. (Tr. 269).

Plaintiff was admitted to St. Joseph's Hospital in February 8, 2005, with complaints of rectal bleeding. (Tr. 222-27). The following day, plaintiff underwent a colonoscopy, during which a sigmoid polyp was removed; internal hemorrhoids were observed. (Tr. 224). It was noted that plaintiff's history "is remarkable for a heart murmur, . . . shoulder injury, and a herniated disc." He was taking Vicodin at the time. (Tr. 222).

On February 17, 2005, plaintiff returned to Northland MidAmerica Orthopedics. He reported that he continued to feel pain in his shoulder. An MRI showed degeneration of the AC joint with biceps tenosynovitis; there was no sign of rotator cuff

---

[14]Kenalog is the "trademark for preparation of triamcinolone acetonide[,]" which is "an ester of triamcinolone; applied topically to the skin or oral mucosa as an antiinflammatory[.]" See Dorland's Illustrated Med. Dict. 992, 1986 (31st ed. 2007).

tear. On examination, plaintiff had a positive grind test and pain on the anterior aspect of the shoulder. The examiner recommended arthroscopic evaluation of the shoulder. (Tr. 234). This procedure was completed on March 10, 2005, with excision of a glenoid labrum tear[15] and removal of a loose body. (Tr. 234, 424).

Plaintiff began physical therapy. (Tr. 267-68). On April 7, 2005, plaintiff reported improvement despite some grinding in the shoulder. He received an injection to decrease scar tissue. He was placed on light duty with a 30-pound limit. (Tr. 233). On April 21, 2005, plaintiff reported continued improvement despite some pain and grinding. He was directed to continue physical therapy and light duty for two more weeks. (Tr. 232). An examination of plaintiff's shoulder on May 5, 2005, showed good motion and function with improving strength. Physical therapy and light duty were continued for another two weeks. Id.

An echocardiogram on May 19, 2005, disclosed mild insufficiency of the mitral and tricuspid valves and left ventricular hypertrophy. (Tr. 295).

Plaintiff returned to Northland MidAmerica Orthopedics for followup on May 23, 2005. He reported continued improvement, although he had some popping in the right shoulder. Physical therapy notes and examination also showed improvement. Plaintiff was referred to a work hardening program, with follow-up in one week for consideration of release to full activities. (Tr. 231). On June 2, 2005, it was noted that plaintiff had missed much of the work hardening program as a result of having his wisdom teeth removed. His referral to the program was extended for an additional week. Id. He was released to full activities on June 13, 2005.

---

[15]The glenoid labral usually tears as a result of a specific trauma such as a fall onto an outstretched arm. It causes pain during motion. Merck Manual of Diagnosis and Therapy 2633 (18th ed. 2006).

Plaintiff was referred to the St. Louis Orthopedic Institute, Inc., where he was seen by Christopher R. Rothrock, M.D., on August 15, and August 29, 2005. (Tr. 392-93; 390-91). Plaintiff reported that, despite the earlier arthroscopic surgery, two cortisone injections, physical therapy, and work hardening, he continued to feel pain deep in his right shoulder, particularly when his arm was in front of him and he performed an internal rotation. X-rays demonstrated a well-aligned glenohumeral joint with a Type I acromion. A new MRI revealed a loose body adjacent to the posterior labrum. On physical examination, Speed's Test[16] and O'Brien's Test[17] both produced pain. Dr. Rothrock noted that some of the findings indicated subtle anterior/superior instability in the right shoulder and recommended another arthroscopic procedure for debridement and possible repair. Plaintiff was directed to avoid excess overhead lifting prior to surgery.

Plaintiff underwent surgery on his right shoulder on September 6, 2005. (Tr. 400-02). Dr. Rothrock noted that plaintiff had a right posterior labral flap tear, which required extensive debridement, and a right anterior Bankart lesion[18] which required reconstruction. Plaintiff was provided with a sling that he was to use for 4 weeks. At follow-up on September 14, 2005, plaintiff reported to Dr. Rothrock that his pain was well controlled with Darvocet. (Tr. 389). Plaintiff was directed to continue using the

---

[16]Speed's sign is a test for biceps tendinitis, injury to the bicipital sheath of the shoulder, or rotator cuff tear. 2 Dan J. Tennenhouse Attorney's Med. Deskbook § 18.4 (4th ed. 2006).

[17]The O'Brien test, or empty can test, is a test for injury to the supraspinatus muscle or superior labrum of the shoulder joint. 2 Dan J. Tennenhouse Attorney's Med. Deskbook § 18.4 (4th ed. 2006).

[18]A Bankhart lesion is a tear in the labrum glenoidale of the shoulder joint arising from a forceful dislocation of the humerus. 1 J.E. Schmidt Attorneys' Dictionary of Medicine, Illustrated B26-B26.1 (28th ed. 1995).

sling and avoid using his right arm for any activity; he was to refrain from driving.  On October 3, 2005, Dr. Rothrock determined that plaintiff was ready to begin an aggressive physical therapy program, with restrictions on all overhead lifting and lifting over 5 pounds.  (Tr. 388).  Plaintiff began physical therapy three times a week, to extend for four weeks.  (Tr. 412).

On November 7, 2005, Dr. Rothrock noted that plaintiff was making "great progress" with restoration of range of motion.  He was directed to continue with aggressive physical therapy with a focus on strengthening.  (Tr. 387).  On December 1, 2005, Sara E. Mann, M.P.T., reported that plaintiff had completed 22 of 27 scheduled physical therapy sessions.  (Tr. 414).  He had made good progress in range of motion and strength and was using his arm more efficiently.  Although plaintiff reported that he was taking less pain medication, he also stated that he was sleeping on the couch because he could not find a tolerable sleeping position in bed.  He rated his pain at level 5 on a 10 point scale at its worst and at 3 at its best.  Scapulohumeral rhythm and joint mobility were "near normal."

On December 5, 2005, Dr. Rothrock noted that plaintiff was in more pain as a result of irritating his shoulder in physical therapy.  Dr. Rothrock suspended physical therapy for the week, with work hardening to follow on a gradually increasing schedule.  In the meantime, Dr. Rothrock imposed a 10-pound weight limit and restricted all overhead lifting.  (Tr. 386).  On examination, plaintiff had full strength, and only mild pain with O'Brien's test and no pain with Hawkins[19] impingement maneuver; Speed's test was negative.  Dr. Rothrock suggested that plaintiff have an MRI arthrogram to

---

[19]Hawkins test checks for impingement of the rotator cuff tendons.  See Merck Manual of Diagnosis and Therapy 2633 (18th ed. 2006).

ensure that there was not additional pathology. The 10-pound limit remained in place. (Tr. 384).

Plaintiff returned to Dr. Rothrock's office on January 23, 2006. (Tr. 382-83). He continued to complain of pain with overhead motion and lifting with his arm away from his body. The MRI arthrogram demonstrated no evidence of a rotator cuff tear and showed appropriate postoperative changes to the anterior inferior labrum. However, Dr. Rothrock noted "a superior labrum that is suspicious for a SLAP tear,"[20] possibly sustained during an incident in physical therapy. Nonetheless, the MRI did not disclose pathology that warranted urgent surgical attention. Dr. Rothrock administered a subacromial injection.

On February 20, 2006, plaintiff reported to Dr. Rothrock that the injection had provided only minimal relief. Dr. Rothrock proposed performing arthroscopic surgery for repair of a suspected SLAP tear that had developed since the most recent surgery. (Tr. 380). Surgery was performed the following day, with extensive debridement of the glenohumeral joint, subacromial decompression and acromioplasty, and SLAP repair. (Tr. 394-96). At follow-up on March 3, 2006, plaintiff appeared to be healing well. (Tr. 379). On March 27, 2006, Dr. Rothrock determined that plaintiff was ready to begin limited physical therapy. (Tr. 378).

At followup on May 8, 2006, Dr. Rothrock noted that plaintiff was making good progress in physical therapy. Plaintiff reported that he experienced mild pain with intermittent popping in his shoulder. Dr. Rothrock determined that plaintiff was ready

_____

[20]"SLAP" stands for a "superior labral, anterior to posterior lesion" -- an injury to the biceps tendon of labrum of the glenoid cavity of the shoulder joint. 5 J.E. Schmidt Attorneys' Dictionary of Medicine, Illustrated S-181 (28th ed. 1995).

for aggressive strengthening physical therapy program. He was restricted to left-handed duty only. (Tr. 377).

An echocardiogram performed on May 26, 2006, indicated left ventricular hypertrophy, mild pulmonary hypertension, and mild insufficiency of the mitral and tricuspid valves. (Tr. 293). A thallium stress test conducted to submaximal exertion was negative. It was noted that the test might underestimate ischemia because it was submaximal. Plaintiff achieved 9 METs.[21] (Tr. 291).

On June 5, 2006, plaintiff reported to Dr. Rothrock that he felt a deep grinding sensation in his shoulder. (Tr. 375). Dr. Rothrock noted that it was likely that plaintiff would always have cracking, popping and grinding due to scar tissue in his shoulder. Plaintiff was cleared for full duty without limitation.

On August 7, 2006, plaintiff reported to Dr. Rothrock that he had returned to work. He stated that with each passing week he experienced increased levels of pain with overhead work. Dr. Rothrock found that plaintiff's shoulder was structurally sound and that he did not require further treatment. He recommended that plaintiff continue the exercises he had learned in physical therapy and take anti-inflammatory medication for pain. Dr. Rothrock imposed a final permanent partial disability rating of 10% at the level of the right shoulder. (Tr. 373).

Plaintiff had a new-patient visit with Erin Piontek, M.D., on October 24, 2006. He complained of painful swelling in his lower ribs. He reported that the pain had begun one or two weeks earlier. He felt the pain when he sat down or took a deep

---

[21]An acronym for "Metabolic Equivalent Task." See University of Iowa Hospitals & Clinics. http://www.uihealthcare.com/topics/medicaldepartments/internalmedicine /champs/metchart.html (last visited on August 17, 2011). A METs of 9 is equivalent to jogging 5.5 miles per hour or lifting and carrying 85 to 100 pounds.

breath; it was worse after eating. (Tr. 528). He noted his prior shoulder surgery in his medical history, but there is no evidence that he complained of shoulder pain at this initial visit. Blood tests were normal. (Tr. 521-22). An ultrasound of abdomen showed no abnormality of the gall bladder, bile duct, or liver. (Tr. 520). An x-ray and CT scan of the chest were normal. (Tr. 512, 516-17).

On April 5, 2007, plaintiff saw Dr. Piontek with complaints of depression, weight gain, constant muscle pain, and gastroesophageal reflux disease (GERD). He reported that he could not walk due to back pain. He also stated that he had run out of his blood pressure medication but did not care. (Tr. 504). Dr. Piontek prescribed Lisinopril, Nexium, Darvocet, and Effexor. On June 8, 2007, plaintiff had inflammation of both ear drums and tenderness in the abdominal area. Although plaintiff reported experiencing pain and grinding in his left shoulder, on examination Dr. Piontek found he had full range of motion with no crepitus or swelling. Dr. Piontek's notes reflect improvement in plaintiff's blood pressure. His depression was improved, but his motivation remained low. A decision was made to increase the dosage of Effexor. (Tr. 494-96).

An x-ray of the left shoulder completed on June 14, 2007, showed no evidence of acute or old bony trauma or any abnormalities. (Tr. 492). An MRI of the left shoulder completed on July 26, 2007, disclosed mild distal infraspinatus tendinopathy without tear and moderate extra-articular biceps tenosynovitis. (Tr. 485). An MRI of the lumbar spine showed small bulges without extruded fragment at L4-L5 and L5-S1. (Tr. 482). On September 5, 2007, plaintiff told Dr. Piontek that he had gone to urgent care for treatment of bronchitis and currently had pain in his ribs. He continued to have tenderness in the epigastric area. (Tr. 476-77).

On September 18, 2007, Ricardo Moreno, Psy.D., completed a Psychiatric Review Technique form.[22]  (Tr. 534-45).  Dr. Moreno determined that plaintiff had depression, which resulted in mild restriction of plaintiff's daily living activities and ability to maintain social functioning and a moderate limitation in maintaining pace, persistence and concentration.  (Tr. 542).  In reaching these conclusions, Dr. Moreno noted that plaintiff and his fiancée reported that plaintiff had impaired sleeping, depressed mood, and social isolation.  (Tr. 544).  He also noted Dr. Piontek's reports that plaintiff's symptoms responded to Effexor.  Although plaintiff listed anxiety as a disabling impairment, he was never diagnosed with anxiety.  He had not seen a mental health professional or had any psychiatric admissions.   Dr. Moreno opined that plaintiff's allegations were only partially credible.  Dr. Moreno also completed a Mental Residual Functional Capacity Assessment.   (Tr. 546-48).   He found no areas of "marked" limitation.  He noted "moderate" limitations in plaintiff's ability to understand, remember, and carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number of breaks.

Dr. Piontek referred plaintiff for evaluation of his left shoulder.   He was examined by Jay Keener, M.D., and Brian Mackey, M.D., on September 19, 2007.  (Tr. 564-69).  Plaintiff reported a four- to five-month history of pain in his left shoulder that was described as episodic and located in the anterior and anterosuperior shoulder with

---

[22]Dr. Moreno refers to records showing that plaintiff had a triple bypass.  He seems to have included in his review medical records belonging to a different Robert Dettmer.  See Tr. 544; Tr. 7-8 (noting reference in records to bypass surgery for patient with different date of birth).

certain motions. (Tr. 567). He felt sharper pain when lifting heavy objects. Examination revealed symmetric scapular posture. Plaintiff had full range of motion of the shoulder and "excellent strength with resisted external rotation and resisted abduction." There was no tenderness noted in the AC joint. Id. Speed, Neer and Hawkins tests were negative, a Yergason's test[23] was slightly positive, and an O'Brien test was "equivocal." (Tr. 566). The biceps tendon was tender to palpation. The diagnosis was biceps tendonitis. Id. He was treated with a steroid injection. (Tr. 568). It was not thought that physical therapy was required at the moment, given plaintiff's high level of functioning in the left shoulder. (Tr. 569).

An examining consultant completed a Physical Residual Functional Capacity form on September 26, 2007. (Tr. 549-54).[24] Based on a review of the medical records, the consultant determined that plaintiff can occasionally lift or carry 20 pounds and frequently carry 10 pounds. He can sit, stand, or walk for about 6 hours in an 8 hour day, and had no limitations in pushing or pulling. He was restricted with respect to overhead reaching. The examiner noted that Dr. Rothrock imposed a permanent restriction of no overhead lifting with right shoulder; this opinion was given "some weight." (Tr. 554).

Plaintiff was seen by Dr. Piontek on December 14, 2007. (Tr. 573-75). Despite being without antidepressant medication, plaintiff denied excessive crying, sadness, hopeless, or fatigue. He also denied chest pain or shortness of breath. His gastroesophageal reflux was better but he still had blood in his stool. He complained

---

[23]Yergason's sign indicates injury to the bicipital sheath of the shoulder. 2 Dan J. Tennenhouse Attorney's Med. Deskbook § 18.4 (4th ed. 2006).

[24]The consultant noted triple bypass as the primary diagnosis, indicating that records for the incorrect Mr. Dettmer were included in the review.

of shoulder pain and stated that he needed a refill of Darvocet prescription. On January 11, 2008, plaintiff complained of a cold. (Tr. 580-81). On February 26, 2008, plaintiff complained of headaches after running out of Darvocet. His blood pressure was improved. (Tr. 582-83). Plaintiff returned for a refill of his Darvocet on March 10, 2008. He complained of pain in his left elbow, which Dr. Piontek assessed as tennis elbow. (Tr. 584). She gave him a brace and directed him to continue taking Naprosyn and Darvocet.

On April 9, 2008, plaintiff reported that he had awakened 5 days earlier with pain in his lower back. (Tr. 586-87). His left leg was sore, but there was no numbness or tingling. Darvocet did not help the pain. On examination, plaintiff had full range of motion of the legs and normal strength, stability and tone. Dr. Piontek prescribed Flexeril and Medrol.[25] Plaintiff complained of blood in his stool and he was referred for a gastroenterology consultation. (Tr. 587). The record does not contain the results of that consultation.

Dr. Piontek completed a Physical Residual Functional Capacity Questionnaire on May 29, 2008. (Tr. 591-95). She listed plaintiff's diagnoses as back pain, limb pain, depression, hypertension, and GERD and assessed his prognosis as "Fair." (Tr. 591). In response to a question asking her to list plaintiff's symptoms, Dr. Piontek wrote, "[complains of] chronic pain at the low back, difficulty with movement; pain at [left] shoulder, [decreased] ROM, grinding; loss of strength." His pain was worse with activity, bending, twisting, or movement of arms; most of the time, the pain was "dull." Under "clinical findings and objective signs," Dr. Piontek identified pain upon

---

[25]Medrol is the brand name for methylprednisolone, a corticosteroid, prescribed to relive inflammation. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682795 .html (last visited on July 29, 2011).

palpation of the low back and pain with movement; otherwise, plaintiff had normal strength and ranges of motion in the legs and left shoulder. (Tr. 591). Dr. Piontek did not identify any side effects from plaintiff's medications. Id. Plaintiff's depression was well-controlled by medication but contributed to the severity of his symptoms. (Tr. 592). Dr. Piontek stated that plaintiff was not a malingerer and that his impairments were reasonably consistent with his symptoms and functional limitations. In her opinion, his pain would rarely interfere with his attention and concentration and he could handle moderate levels of work stress. Id. Regarding plaintiff's physical capacity and limitations, Dr. Piontek estimated that plaintiff could walk 3 to 4 blocks without rest or severe pain; could sit or stand for 30 minutes at a time; and in an 8-hour workday, he could sit for a total of 4 hours and stand or walk for a total of 4 hours. (Tr. 592-93). She further opined that plaintiff must walk every 45 minutes for about 15 minutes. He needed a job that would permit shifting positions at will but that he would not need unscheduled breaks. He did not need to elevate his legs or use a cane. (Tr. 593). Dr. Piontek indicated that plaintiff could frequently lift 10 pounds or less, occasionally lift 20 pounds, and never lift 50 pounds. He was limited to overhead reaching no more than 10% of the day. She indicated that plaintiff could frequently turn his head to the left or right, but only occasionally look down, look up, or hold his head in a static position. He was likely to miss work 2 days each month due as a result of his impairments or for treatment. (Tr. 594).

Plaintiff saw Dr. Piontek on January 19, 2009. (Tr. 596-97). He complained of pain and drainage from his ear. He reported that he had lost his insurance and been off most of his medications, including his pain medications. He told Dr. Piontek that

the injection he received for shoulder pain helped.  He had undergone a gastroenterology evaluation but Dr. Piontek did not have the results.

An MRI arthrogram of the left shoulder was completed on April 16, 2009.  (Tr. 600).  It showed a "possible posterior glenoid labral tear which is inconsequential with symptoms."  More significant was the supraspinatus tendonosis and "a little AC joint degeneration."  He was given an injection and instructed to go to physical therapy. (Tr. 598).

## IV.  The ALJ's Decision

In the decision issued on July 21, 2009, the ALJ made the following findings:

1.    Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2011.

2.    Plaintiff engaged in disqualifying substantial gainful activity between October 13, 2004, the alleged date of onset, and April 1, 2005.

3.    Plaintiff has the following severe impairments:  obesity, degenerative joint disease, tendonitis, and a history of bilateral shoulder problems.

4.    Plaintiff does not have an impairment or combination of impairments that meets or substantially equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.    Plaintiff has the residual functional capacity to perform light work, except that he should never climb ropes, ladders, or scaffolds.  He can occasionally climb ramps[26] and stairs; frequently balance, stoop, kneel, crouch and crawl; frequently reach in all directions;  frequently reach overhead with his left arm and never reach overhead with his right arm; and should avoid concentrated exposure to industrial hazards and unprotected heights.

6.    Plaintiff is unable to perform his past relevant work.

7.    Plaintiff was 33 years old, a younger individual, on the date of the decision.

_____

[26]The decision says "ropes and stairs."  Because the ALJ explicitly excluded ropes in the previous phrase, the Court has substituted "ramps."

8. Plaintiff has a marginal education and is able to communicate in English.

9. Transferability of skills is not an issue because plaintiff is limited to unskilled work.

10. Considering the plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the plaintiff can perform.

11. Plaintiff has not been under a disability, as defined in the Social Security Act, from October 13, 2004, through the date of the decision.

(Tr. 39-46).

## V. Discussion

To be eligible for disability insurance benefits, plaintiff must prove that he is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which can be expected to last for a continuous period of not less than 23 months." 42 U.S.C. §§ 423(d)(1)(A), 1382(a)(3)(A) (2000). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner employs a five-step evaluation process, "under which the ALJ must make specific findings." Nimick v. Secretary of Health and Human Servs., 887 F.2d 864, 868 (8th Cir. 1989). The ALJ first determines whether the claimant is engaged in substantial gainful activity. If the claimant is so engaged, he is not disabled. Second, the ALJ determines whether the

claimant has a "severe impairment," meaning one which significantly limits his ability to do basic work activities.  If the claimant's impairment is not severe, he is not disabled.  Third, the ALJ determines whether the claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  If the claimant's impairment is, or equals, one of the listed impairments, he is disabled under the Act.  Fourth, the ALJ determines whether the claimant can perform his past relevant work.  If the claimant can, he is not disabled.  Fifth, if the claimant cannot perform his past relevant work, the ALJ determines whether he is capable of performing any other work in the national economy.  If the claimant is not, he is disabled.  See 20 C.F.R. §§ 404.1520, 416.920 (2002); Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).

### A.    Standard of Review

The Court must affirm the Commissioner's decision, "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled."  Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997).  "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion."  Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)).  If, after reviewing the record, the Court finds it possible to draw two inconsistent from the evidence and one of those positions represents the Commissioner's findings, the Court must affirm the decision of the Commissioner.  Buckner v. Astrue, --- F.3d ---, 2011 WL 2803017, at *6 (8th Cir. July 19, 2011) (quotations and citation omitted).

### B.    Plaintiff's Allegations of Error

Plaintiff contends that the ALJ (1) incorrectly determined his Residual Functional Capacity, (2) posed improper hypotheticals to the vocational expert, and (3) should have awarded a period of benefits from October 2004 through December 5, 2005.

## 1. The ALJ's Residual Functional Capacity Determination

Plaintiff argues that the ALJ's RFC determination is not supported by medical evidence and that he failed to give proper weight to Dr. Piontek's opinion. In addition, he argues that the ALJ should have recontacted Dr. Piontek for clarification or additional information.

"RFC is defined as the most a claimant can still do despite his or her physical or mental limitations." Martise v. Astrue, 641 F.3d 909, 923 (8th Cir. 2011) (internal quotations, alteration and citations omitted). "The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC." Id. (citation omitted). "However, the burden of persuasion to prove disability and demonstrate RFC remains on the claimant." Id. Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner. Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007) (citing 20 C.F.R. §§ 416.927(e)(2), 416.946 (2006)).

Based on his review of the medical evidence and his credibility determination, the ALJ determined that plaintiff had the RFC to perform light work,[27] except that he should never climb ropes, ladders, or scaffolds. Plaintiff could occasionally climb ramps

---

[27]The regulations define "light work" as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." "[A] job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567, § 416.967(b).

and stairs; frequently balance, stoop, kneel, crouch and crawl; frequently reach in all directions; frequently reach overhead with his left arm and never with his right arm; and should avoid concentrated exposure to industrial hazards and unprotected heights. (Tr. 40-41).

Plaintiff asserts that the ALJ incorrectly stated that there was no objective medical evidence to support his claim of a disabling condition of the spine. Plaintiff testified at the hearing that he had a herniated disc in his lumbar spine. The ALJ correctly noted that an MRI of the lumbar spine completed in June 2007 showed small bulges without extruded fragment at L4-L5 and L5-S1. (Tr. 482). There is no evidence in the record to support plaintiff's claim of a herniated disc. There was also no evidence of sciatica, other than a single report of left leg pain in April 2008. (Tr. 586-87). And, on that occasion, there was no numbness or tingling and plaintiff had full range of motion, and normal stability, strength, and tone. The ALJ did not commit any error in rejecting plaintiff's contention that he has a herniated lumbar disc.

Plaintiff contends that the only medical evidence relevant to the determination of his RFC is found in the records of Dr. Rothrock and Dr. Piontek. Dr. Rothrock provided care for plaintiff's right shoulder injury. Plaintiff had three surgical procedures performed on this shoulder between March 2005 and February 2006. At an office visit in August 2006, Dr. Rothrock noted that plaintiff had returned to work without limitations. Plaintiff complained of increasing pain which he attributed to the overhead tasks required by his job. On examination, Dr. Rothrock found that plaintiff had normal ranges of motion, almost full strength, and no or minimal pain in response to diagnostic tests. Dr. Rothrock opined that plaintiff required a permanent restriction with no overhead lifting with his right shoulder. He directed plaintiff to continue with

the exercises he learned in physical therapy and to take anti-inflammatory medicines for occasional pain. (Tr. 373). Dr. Rothrock did not impose any other restrictions that were incompatible with the performance of light duty work. The ALJ's RFC determination acknowledged the restriction on overhead work with the right shoulder and thus is not inconsistent with Dr. Rothrock's assessment.

Plaintiff contends that the ALJ erred in rejecting Dr. Piontek's assessment of his RFC, completed in May 2008. In her RFC assessment, Dr. Piontek listed plaintiff's diagnoses as back pain, limb pain, depression, hypertension, and GERD. (Tr. 591). His symptoms included complaints of chronic pain at the low back, difficulty with movement, pain in the left shoulder, decreased range of motion and grinding, and a loss of strength. Id. Dr. Piontek observed that plaintiff had pain on palpation of the low back and pain on movement. Despite his complaints of pain, however, plaintiff had normal strength in the lower legs and left shoulder, and a normal range of motion in the left shoulder. Id.

"The record must be evaluated as a whole to determine whether the treating physician's opinion should control." Tilley v. Astrue, 580 F.3d 675, 679 (8th Cir. 2009). When a treating physician's opinions "are inconsistent or contrary to the medical evidence as a whole, they are entitled to less weight." Halverson v. Astrue, 600 F.3d 922, 930 (8th Cir. 2010) (quoting Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir.2002)). "A treating physician's opinion does not automatically control, since the record must be evaluated as a whole." Perkins v. Astrue, --- F.3d ---, 2011 WL 3477199, *2 (8th Cir. 2011) (quoting Medhaug v. Astrue, 578 F.3d 805, 815 (8th Cir. 2009)).

First, as the Commissioner notes, the ALJ adopted Dr. Piontek's restrictions with respect to weight, climbing ladders, using stairs, and overhead reaching with his right arm. Thus, it is clear that the ALJ gave careful consideration to Dr. Piontek's assessment. The ALJ rejected Dr. Piontek's restrictions on plaintiff's use of his left arm, finding that she "relied quite heavily on the subjective report of symptoms and limitations described by [plaintiff], and seemed to uncritically accept as true most, if not all, of what [he] reported." (Tr. 44). The ALJ noted that Dr. Piontek's own office notes and reports did not demonstrate the type of significant clinical and laboratory abnormalities consistent with a disabling condition. For example, an MRI of the left shoulder completed in July 2007 showed only mild tendinopathy and moderate biceps tenosynovitis.[28]

Other evidence in the record supports the ALJ's conclusion: In September 2007, Dr. Keener administered an injection to treat pain in the left shoulder, but determined that plaintiff did not need physical therapy given the high level of functioning in his shoulder. (Tr. 569). In December 2007, plaintiff complained of shoulder pain. Dr. Piontek's examination did not result in any objective findings consistent with a disabling condition; indeed, she noted that plaintiff was "in no distress." (Tr. 573-74). In February 2008, plaintiff complained of neck pain, but not shoulder pain, and again appeared to be in no distress. (Tr. 582). In March 2008, plaintiff complained of left elbow pain for which Dr. Piontek provided a brace and exercises. (Tr. 584). The record does not reflect any subsequent complaints of pain in that arm or elbow.

_____

[28]Elsewhere in the opinion the ALJ considered plaintiff's activities of daily living, his work history, and the medications he took and their expected side effects.

As this review of the record shows, at the time Dr. Piontek completed her RFC assessment in May 2008, the objective clinical evidence suggested that plaintiff had mild recurrent problems with his left shoulder. These findings are inconsistent with the level of restriction that Dr. Piontek imposed on plaintiff's use of his left arm and shoulder. With respect to the restrictions she imposed on plaintiff's neck movement, the record reflects a single complaint of neck pain and no clinical findings indicative of cervical spine conditions. The ALJ did not err in discounting those portions of Dr. Piontek's opinion that were unsupported by objective medical evidence. Stormo v. Barnhart, 377 F.3d 801, 805-06 (8th Cir. 2004) (treating physicians' opinions given less weight if they are inconsistent with the record as a whole or consist of vague conclusory statements unsupported by medically acceptable data).

Plaintiff argues that the ALJ should have recontacted Dr. Piontek. "An ALJ should recontact a treating or consulting physician if a critical issue is undeveloped." Martise v. Astrue, 641 F.3d 909, 926 (8th Cir. 2011). However, a lack of medical evidence to support a doctor's opinion does not equate to underdevelopment of the record as to a claimant's disability. Id. at 927. The ALJ did not err in failing to recontact Dr. Piontek.

The Court concludes that the ALJ did not commit any error in discounting portions of Dr. Piontek's opinion of plaintiff's limitations. The Court further concludes that the ALJ properly considered the record in determining plaintiff's RFC and that substantial evidence in the record supports the ALJ's RFC determination.

### 2. The Hypothetical Questions Posed to the Vocational Expert

Plaintiff alleges that the hypothetical questions posed to the vocational expert were insufficient because they were based on the ALJ's incorrect RFC determination.

The Court has determined that the ALJ's RFC determination is supported by substantial evidence and thus rejects plaintiff's challenge to the hypotheticals.

### 3. Period of Disability from October 2004 to December 2005

Plaintiff argues that the record reflects a greater than 12-month period of continuous disability between October 2004 through December 2005, thus entitling him to benefits for that time. Plaintiff's claim for benefits for this period fails for two reasons. First, the record shows that plaintiff had substantial earnings from his job as a diesel truck mechanic in January, February, July, August, and September 2005. (Tr. 101). The ALJ excluded plaintiff's employment after April 2005 as an unsuccessful work attempt. Even with this exclusion, however, plaintiff had disqualifying employment during the period in which he claims to have been disabled. Second, no physician during that time period imposed restrictions that would have kept plaintiff from performing light duty work. Plaintiff has failed to establish that he had a disabling impairment for 12 continuous months.

### VI. Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole. Therefore, plaintiff is not entitled to relief.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by plaintiff in his brief in support of complaint [#16] is **denied**.

A separate judgment in accordance with this order will be entered this same date.

CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 6th day of September, 2011.